IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ASIATIC ROYALPRINCE ALLAH, | ) | Case No. 7:19-CV-00633 |
| a.k.a. VERNON LEE BROOKS, JR., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY KISER, et al., | ) | By: Hon. Michael F. Urbanski |
| Defendants. | ) | Chief United States District Judge |

## MEMORANDUM OPINION

Asiatic Royalprince Allah, a.k.a. Vernon Lee Brooks, Jr., currently incarcerated at Red Onion State Prison (ROSP) and proceeding pro se, complains that Defendants violated his constitutional rights under the First and Fourteenth Amendments and also under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1 et seq. All of the Defendants—ROSP Warden Jeffrey Kiser, Virginia Department of Corrections (VDOC) Western Regional Administrator Marcus Elam, VDOC Western Regional Ombudsman R.H. Bivens, VDOC Chief of Corrections Operations A. David Robinson, VDOC Director Harold Clarke, ROSP Correctional Lieutenant James Lambert, ROSP Chaplain C. Cauthorne, ROSP Grievance Coordinator G.D. Adams, ROSP Grievance Coordinator J.B. Messer, ROSP Unit Manager Walter Swiney, and ROSP Property Officer J. Owens—have filed a motion for summary judgment. ECF No. 25. Allah responded to the motion for summary judgment, making this matter ripe for disposition. For the reasons set forth below, the motion for summary judgment is **GRANTED** and all claims against the Defendants are **DISMISSED**.

# I.     Background

## A.  Allah's Claims

Allah claims that Defendants violated his rights under the First Amendment, RLUIPA, and his right to equal protection under the Fourteenth Amendment. Allah is a member of the Nation of Gods and Earths (NGE), a religion that was previously designated as a security threat group (STG) within VDOC, but is now treated as a religious group. His First Amendment and RLUIPA claims allege that Defendants (1) denied him access to NGE congregate services; (2) denied him a Commissary Special Order Form ("Commissary Form") to purchase pre-approved religious items, including a Universal Flag, a crown, and a medallion; (3) classified him as part of an STG and refused to remove the gang-affiliated charges from his disciplinary record; and (4) repeatedly disapproved his NGE newspapers called The Five Percenter, erroneously concluding that they violated VDOC's publication policy. He also alleges that Defendant Swiney confiscated his identification card with his legally adopted cultural name and replaced it with the name under which he was convicted and sentenced, Vernon Brooks. His equal protection claim under the Fourteenth Amendment is based on the same alleged actions.[1]

## B.  Factual Allegations

The following facts, which are taken from the pleadings and attached exhibits, are construed in the light most favorable to Allah. Allah is a follower of the NGE. Also known as

---

[1] In its factual section, Allah's complaint states that Swiney "retaliated" against him in confiscating his identification card and in conducting what Allah says was a "sham" hearing regarding his security classification, which Allah says was based on an allegedly false disciplinary charge others brought against him. Compl., ECF No. 1 at 8–9.  He does not include a retaliation claim in the list of his claims in the complaint, however.  Id. at 16–18.  Additionally, defendants did not construe his complaint as asserting a retaliation claim, and he did not object to their characterization of his claims.  Thus, the court does not construe his complaint as asserting a retaliation claim.

the Five Percenters, NGE was founded in the 1960s by Clarence 13X Smith. Compl., ECF No. 1 at 5. Members of NGE believe that "male members of the group are 'Gods,' while females are called 'Earths.'" Id. Further, members of NGE believe that the world's population has three categories: "the Five Percent, the ten percent, and the eighty-five percent." Id. "[T]he ten percent teach the eighty-five percent to believe in the existence of a 'Mystery God' and thereby keep[] the eighty-five percent enslave[d] by having them worship something that they cannot see[,]" while the remaining five percent are the "poor, righteous teachers who do not believe in the teachings of the ten percent and instead teach the identity of the true and living God, as well as freedom, justice, and equality to all human families of the planet earth." Id.

NGE members study a religious text known as the 120 Degrees and utilize the Supreme Alphabet and the Supreme Mathematics to "understand[] man's relationship to the universe and Islam, as well as to understand[] and interpret[] the 120 [D]egrees." Id. at 6 (internal quotations omitted). Monthly, NGE members receive The Five Percenter, a newspaper that includes information about current events and activities, editorials, and lessons from the 120 Degrees, the Supreme Mathematics, and the Supreme Alphabet. Id. Members also attend gatherings, including civilization classes, parliaments, rallies, and honor days. Id. NGE's official symbol is the Universal Flag, which is on NGE literature and crowns. Id. at 7. NGE crowns "are similar to a Kufi worn by Muslims, except that they often have tassels on them symbolizing the planet and the moon, with the person representing the sun." Id.

Allah was, at all times relevant to this lawsuit, housed at ROSP as a security level "S" offender.[2] ECF No. 26 at 3. Even though level "S" offenders live in restrictive housing units

---

[2] ROSP and Wallens Ridge State Prison house all of VDOC's level "S" inmates. See Barnard v. Clarke, No. 7:15CV00160, 2016 WL 5373043, at *1 (W.D. Va. Sept. 26, 2016). Level "S" is reserved for

away from the general prison population, level "S" offenders are "afforded access to religious guidance" and may request visits from spiritual leaders. Affidavit of David Robinson, ECF No. 26-4, ¶ 8. In October 2017, Allah began requesting NGE programming. Compl., ECF No. 1 at 8. Allah alleges that after he made these requests, Defendant Swiney "began coming to [P]laintiff['s] cell door in D-building restrictive housing, taunting him about his belief in the teaching of the Nation of Gods and Earths[,] as well as his legally adopted cultural name, Asiatic Royalprince Allah, which was on [P]laintiff's prison I.D. card at the time." Id. Defendant Swiney allegedly threatened to move Allah to a different building if Allah continued to request access to NGE programming. Id.

Allah alleges that Defendant Swiney then confiscated Allah's prison I.D. card and replaced it with a different I.D. card that listed his name as Vernon Brooks—the name under which Allah was incarcerated. Id. Defendant Swiney also allegedly changed Allah's name back to Vernon Brooks in his institutional record. Id. Allah states that his "I.D. card and his institutional record reflected his legally adopted name, Asiatic Royalprince Allah, for 7 years prior to [D]efendant Swiney vindictively chang[ing] it." Id.

On February 6, 2018, Allah received an institutional charge for drawing a picture of a knife on the metal table in his cell and was found guilty of this charge. Id. at 9. On February 16, 2018, Defendant Swiney approved an institutional classification authority hearing

---

inmates who must be managed in a segregation setting. Based on VDOC Operating Procedures, offenders are classified as level "S" based on segregation qualifiers, including: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]omission of [c]rime of [e]xceptional [v]iolence and/or [n]otoriety";  and gang activity or leadership. See VDOC Operating Procedure 830.2(IV)(G), available at https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-830-2.pdf (last visited Mar. 23, 2021). On March 11, 2020, Allah was designated a security level 5 offender at ROSP and is now housed in the general population. ECF No. 26 at 4.

recommendation to regress Allah to C-building restrictive housing for privilege level IM-0 inmates.[3] Id. Allah alleges that he was falsely given the institutional charge and that the institutional classification authority hearing was a "sham." Id. Nevertheless, Allah was transferred and regressed to a privilege level of IM-0.

### 1. Religious Policies at VDOC

After moving to C-building restrictive housing, Allah was not allowed to congregate with other NGE members. Id. at 10. Allah was allowed to study his religion on his own through the use of his copies of the 120 Degrees, the Supreme Mathematics, and the Supreme Alphabet. Compl., ECF No. 1 at 10. He also could request a visit from the institutional chaplain or from a civilian spiritual leader. Robinson Aff., ECF No. 26-4, ¶ 8. Allah submitted a request to Defendant Chaplain Cauthorne to attend NGE services, but Allah's request was denied. Compl., ECF No. 1 at 10.

Level "S" offenders do not have televisions in the common area outside of their cells. Robinson Aff., ECF No. 26-4, ¶ 5. However, all level "S" offenders, except for those designated "IM-0" or "SM-0," can have personal televisions in their cells and can participate in religious services via closed-circuit television. Robinson Aff., ECF No. 26-4, ¶¶ 12, 13; Operating Procedure ("OP") 841.3, ECF No. 26-4 at 30. Allah submitted multiple request forms to Defendant Cauthorne to receive accommodation for NGE programming on the

---

[3] Level "S" offenders are assigned to one of three privilege levels: intensive management (IM), special management (SM), or the reentry unit. See Barnard, 2016 WL 5373043, at *2. Offenders can be placed under IM-0 status if they exhibit "the potential for extreme and/or deadly violence, as indicated by a history of violent disciplinary infractions against staff or other inmates, and an extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." Id. (internal quotations omitted). Offenders can also be placed under IM-0 status because of their "routinely disruptive and threatening pattern of behavior and attitude or because [they are] incarcerated for a notorious crime that puts [them] at risk from other offenders." Id. (internal quotations omitted). Offenders are further sub-classified in their privilege levels, with IM-0 as "the most restrictive status[.]" Id.

ROSP closed-circuit institutional religious channel. Compl., ECF No. 1 at 10. Defendant Cauthorne replied to Allah's request by saying that he has no funds to purchase religious videos and that no NGE DVDs had been donated to ROSP, so Cauthorne had no way to play NGE services.[4] Compl., ECF No. 1 at 10, 12. Allah appealed Defendant Cauthorne's decision to prison authorities, but all of his appeals were denied. Id. at 12–13.

### 2. Nation of Gods and Earths Religious Items

Offenders at VDOC facilities can purchase religious faith items that are approved for offender possession under OP 841.3. See List of Approved Religious Items, ECF No. 26-4 at 49–51, 64. Religious items are not regularly stocked at the commissary but are available to offenders through a special ordering process. Id. at 64. Offenders must give a completed Commissary Form to the Facility Unit Head or other designated official for review. Id. The NGE medallion and crown are approved by VDOC for offender possession. Id. at 49. The Universal Flag is approved by VDOC for communal use only, and when not in use, it must be stored in the chaplain's office. Id. at 51.

Allah alleges that he repeatedly asked officials at ROSP for a Commissary Form. ECF No. 35 at 15. Allah submitted request forms to ROSP's commissary department requesting the Commissary Form so that he could order a Universal Flag, a crown, and a medallion. Compl., ECF No. 1 at 12. An ROSP Commissary Officer, R. Mullins, who is not a named defendant, twice declined to give Allah a Commissary Form and responded to Allah's request

---

[4] Allah notes that "[e]ach religious group such as: Sunni Muslim, Nation of Islam, Roman Catholic, Jewish or Messianic Jewish[,] etc. have a specific time and day when videos are played on the institutional religious channel at Red Onion State Prison to accommodate inmates for their religion while housed in restrictive housing. However, there are no videos being played on the institutional religious channel at Red Onion State Prison to accommodate members of the Nation of Gods and Earths housed in restrictive housing." Compl., ECF No. 1 at 9.

by saying that the items he requested were not approved by VDOC. Id.; Offender Request form, ECF No. 35-2 at 51–54.

On February 24, 2019, Allah filed an informal complaint regarding the commissary's denial of "his right to order approved religious items of the Nation of Gods and Earths." Compl., ECF No.1 at 13. Defendant Owens responded and told Allah to speak with someone at the commissary about the form. Id. Allah appealed this response to Defendant Kiser using a regular grievance, but Defendant Adams denied the grievance at intake and told Allah to write to the commissary for the form. Id. Allah then appealed this response to Defendant Bivens, who upheld the decision. Id. On May 1, 2019, Allah submitted another informal complaint "on the issue of being systematically denied a [C]ommissary [S]pecial [O]rder [F]orm." Id. Allah then submitted a regular grievance and received no response. Id. Allah wrote to Defendant Bivens to informally solve the problem, but he received no response. Id.

### 3. Security Threat Group Designation

Prior to 2017, NGE was classified as an STG. In 2017, this changed following the decision in Coward v. Robinson, 276 F. Supp. 3d 544, 576 (E.D. Va. 2017), which ordered VDOC "to remove the STG designation from the NGE, recognize it as a religion, and afford it the rights and privileges" of all other offender religious programs. As a result, VDOC approved NGE as a religious group, and "VDOC's Security Threat Unit took measures to remove the [STG] designation from any offender who was designated as a member of an STG solely on the basis of his or her affiliation with NGE." ECF No. 26 at 6; see also ECF No. 26-4 at 46 (listing NGE as a religion approved to operate in VDOC facilities under OP 841.3). Allah claims that he has "gang affiliated institutional charges" on his record and has been

7

identified "as a gang member for possession of Nation of Gods and Earths material." Compl.,
ECF No. 1 at 14.

Beginning on March 18, 2019, Allah made a number of attempts to grieve the issue of
STG designation and related disciplinary charges, and contends that often responses were not
received or his efforts were otherwise thwarted. Regardless, his efforts did not resolve his
complaints. Because Defendants are not arguing that he failed to exhaust his administrative
remedies, however, the court does not detail those efforts here.

### 4. __The Five Percenter__ Newspaper

VDOC allows offenders to receive publications. ECF No. 26-4 at 70. However,
pursuant to OP 803.2, all publications are reviewed at the facility prior to distribution. Id. at
72. Publications can be disapproved for offender possession for many reasons, including if
the material "emphasize[s] depictions or promotions of violence, disorder, insurrection,
terrorist, or criminal activity," if the material "depicts, describes, or promotes gang bylaws,
initiations, organizational structure, codes, or other gang-related activity or association," or if
the material's "content could be detrimental to the offender rehabilitative efforts or the safety
or health of offenders, staff, or others based on the offender's specific criminogenic needs."
Id. at 76. If a publication is disapproved, offenders may appeal the disapproval through a
multi-level appeals process. Id. at 74.

In 2017, Allah began ordering The Five Percenter. Compl., ECF No. 1 at 14. He
received every issue of The Five Percenter until March 2018, when ROSP officials began
disapproving the publication. Id. Allah received multiple notifications that copies of The Five
Percenter had been disapproved for violating OP 803.2. Id. at 15. Allah's copies of The Five
Percenter were denied, for example, as "material that depicts, describes, or promotes gang

bylaws, initiations, organizational structure, codes, or other gang-related activity or association[,]" ECF No. 1-1 at 133, and as "material whose content could be detrimental to the offender rehabilitative efforts or the safety or health of offenders, staff, or others based on the offender's specific criminogenic needs." Id. at 143. Each time Allah was notified that The Five Percenter was disapproved, he appealed the decision to Defendant Kiser, who always deemed the grievance unfounded. Compl., ECF No. 1 at 15. Allah then appealed each decision to Defendant Elam, who always upheld Defendant Kiser's decision. Id. Finally, Allah appealed this decision to Defendant Robinson, who approved Allah's grievance and allowed Allah to receive that particular The Five Percenter issue. Id. Allah notes that "[b]y the time [he] received his newspapers[,] they were 2 or 3 months old." Id.

## C.  Relief Sought

Based on the alleged constitutional violations, Allah seeks (1) declaratory relief declaring Defendants have violated his rights to free exercise under the First Amendment and RLUIPA; (2) declaratory relief declaring Defendants have violated his rights to equal protection under the Fourteenth Amendment; (3) compensatory and punitive damages; (4) a bench trial on all issues; (5) all costs Allah has incurred as a result of bringing forth this action; (6) permanent injunctions ordering Defendants to (a) remove gang-affiliated charges from Allah's record, (b) remove the STG designation from Allah's record, (c) afford Allah and other NGE adherents in restrictive housing the opportunity to watch NGE videos on the institutional religious channel, (d) provide closed-circuit television access to observe NGE honor days, civilization classes, rallies, and parliaments, (e) permit the wearing of crowns and display of the Universal Flags, (f) allow NGE adherents to purchase approved NGE materials,

publications, and symbols from NGE vendors; and (7) any remedies known or unknown as deemed just by the court.

In their motion for summary judgment, Defendants first note that some of Allah's claims fail as a factual matter. For example, they note that Allah is no longer classified as a member of an STG and has not been since 2017, that there is no "ban" on the religious items sought but that Allah simply failed to follow the proper procedures for ordering them, and that there is no "ban" on The Five Percenter newspaper. They further argue that (1) Allah's claims under RLUIPA, the First Amendment, and the Equal Protection Clause seeking injunctive relief are moot due to his updated status as a security level 5 offender and his move to the general prison population; (2) prison limitations on congregate religious activities are reasonable and do not violate the First Amendment; (3) VDOC regulations regarding congregate religious activities for level "S" offenders do not violate the Equal Protection Clause; (4) Defendants are entitled to qualified immunity as to the individual-capacity claims for damages on the First Amendment and Equal Protection claims regarding congregate religious activities;[5] and (5) Allah cannot establish that many of the Defendants were personally involved in the deprivation of the claimed religious rights or that they acted with sufficient discriminatory intent.

---

[5] Because the court finds that summary judgment is appropriate for all Defendants on all claims, it does not separately address their arguments regarding qualified immunity or the lack of personal involvement by specific defendants. Furthermore, presumably defendants sought qualified immunity only on the constitutional claims because damages are not available to Allah under RLUIPA in any event, as discussed below.

## II. Applicable Law

### A.  Summary Judgment Standard

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover,

"[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## B. Available Remedies

As an initial matter, a prisoner bringing a cause of action under RLUIPA is not entitled to money damages against state defendants in either their individual or official capacities. Wall v. Wade, 741 F.3d 492, 496 n.5 (4th Cir. 2014) (citing Sossamon v. Texas, 563 U.S. 277, 293 (2011) (official capacities); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (individual capacities)). Thus, Allah is limited to seeking equitable relief under RLUIPA. Id. Therefore, any claims he brings for monetary damages against the Defendants under RLUIPA are **DISMISSED**.

In addition, claims for money damages brought against defendants in their official capacities are not cognizable in § 1983 lawsuits because neither a state nor its officials acting

in their official capacities are persons for purposes of § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). A claim brought against a person in his or her official capacity is considered a suit against the official's office. Because the Eleventh Amendment prohibits courts from entertaining an action against the state, Alabama v. Pugh, 438 U.S. 781, 782 (1978), it also prohibits courts from considering claims for damages against defendants in their official capacities. Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996). Accordingly, all claims for money damages brought by Allah against Defendants in their official capacities are **DISMISSED**.

However, a plaintiff may seek prospective injunctive relief against state defendants in their official capacities. Will, 491 U.S. at 71; Graham v. Kentucky, 473 U.S. 159, 167 n. 14 (1985). "To ensure enforcement of federal law . . . the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). Allah's claims for injunctive relief will be considered in context below.

## C. RLUIPA

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a).

A substantial burden on religious exercise occurs when a government, through act or omission, "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quoting Thomas v. Review Bd. of

Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981)). The plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion. See, e.g., Krieger v. Brown, 496 F. App'x 322, 324 (4th Cir. 2012); Adkins v. Kaspar, 393 F.3d 559, 567 n.32 (5th Cir. 2004); Civil Liberties for Urban Believers v. Chicago, 342 F.3d 752, 760 (7th Cir. 2003). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his religion."  Krieger, 496 F. App'x at 325 (citing Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a . . . plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011). Also, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. Living Water Church of God v. Charter Twp. of Meridian, 258 F. App'x 729, 739 (6th Cir. 2007).

Once a plaintiff produces prima facie evidence to support the claim that the challenged practice or law substantially burdens his exercise of religion, the government bears the burden of persuasion on whether the practice or law is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-2(b). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Jehovah v. Clarke, 798 F.3d 169, 177 (4th Cir. 2015) (quoting

14

Holt v. Hobbs, 574 U.S. 352, 364–65 (2015)) (internal quotation marks and citations omitted). "If a less restrictive means is available for the Government to achieve its goals, the Government must use it." Holt, 574 U.S. at 365 (citations and alterations omitted).

In evaluating whether the least-restrictive means test is satisfied, courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (citations omitted) (internal quotation marks omitted). "RLUIPA . . . is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs." Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007) (citation omitted). However, courts should not "mechanically accept" prison administrators' rationale for restricting religious exercise. Lovelace, 472 F.3d at 190.

## D. First Amendment

Inmates retain protections provided by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). Nevertheless, inmates' rights are evaluated in the context of their incarceration and courts accord deference to prison officials. Lovelace, 472 F.3d at 199. In the context of prison regulations, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators …, and not the courts, [are] to make the difficult judgments concerning institutional operations.'" Turner v. Safley, 482 U.S. 78, 89 (1987) (quoting Jones v. N.C. Prisoners' Union, 433 U.S. 119, 128 (1977)). Thus, the

First Amendment affords less protections to inmates' free exercise rights than does RLUIPA.

<u>Lovelace</u>, 472 F.3d at 199–200.

## E.  Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike by the government. <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439–41 (1985). To establish a violation of the Equal Protection Clause, a plaintiff must show that he has been treated differently from others who are similarly situated and that the unequal treatment was intentional or purposeful. If a plaintiff makes such a showing, the court then determines whether the disparity in treatment can be justified under the requisite level of scrutiny. <u>Morrison v. Garraghty</u>, 239 F.3d 648, 654 (4th Cir. 2001).

## III. Discussion

## A.  Failure to Provide Access to NGE Services and Events

Allah claims that while a level "S" offender at privilege level "0" he repeatedly made requests to either attend NGE religious events in person or to watch NGE religious events on the institutional religious channel but was not allowed to do so. Allah claims that his inability to attend NGE religious events in person or to watch NGE religious events on the institutional religious channel violated his rights under RLUIPA and the First Amendment and also his right to equal protection.

Defendants argue that Allah's claims regarding his inability to attend or to watch NGE congregate religious services are moot because Allah has been reclassified as a level 5 offender and is permitted to attend congregate religious services for NGE and can have a personal television. ECF No. 26 at 10. Allah counters that his claims are not moot because there is no guarantee that the defendants' wrongful behavior will not recur. ECF No. 35 at 28.

The court finds that Allah's claims remain live under the voluntary cessation doctrine. To moot a legal challenge, the voluntary cessation doctrine requires the defendants to show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). Although Allah currently has access to NGE congregate religious services, Defendants and other VDOC officials still retain the authority to change Allah's classification to a level "S" offender with a privilege level of "0". If Allah were to be reclassified to these levels, he would not have access to NGE congregate services. Because Allah could be regressed to his former classification at any time, his claims are not moot. See Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) ("[W]hen a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claim should not be dismissed as moot."). Accordingly, the court will evaluate Allah's claims regarding the failure to provide access to NGE services and events.

### 1. RLUIPA and First Amendment Claims

Under RLUIPA, in order to show that the failure to provide access to NGE religious services and events creates a substantial burden on his ability to exercise his religion, Allah must show that it puts substantial pressure on him to modify his behavior and violate his beliefs. Alternatively, he must show that the lack of access to NGE programming forces him to choose between following his religion and forfeiting governmental benefits or abandoning his religion.

Allah has two claims regarding his access to NGE religious services: that he cannot attend religious services in person because of his classification and also that he cannot watch religious programming on television. First, he claims that his inability to attend NGE religious

services in person violated his rights under RLUIPA. Allah states that "congregation in both study and celebration is integral to obtaining spiritual righteousness." Compl., ECF No. 1 at 10. Additionally, Allah notes that NGE civilization classes and group meetings are "mandatory to attend." ECF No. 35 at 26. Viewing the evidence in the light most favorable to Allah, he has shown that a fact issue exists on the first prong of his RLUIPA claim by pointing out that the IM-0 restrictions prevented him from participating in group religious services as he could have done when in the general prison population, thus causing him to violate his beliefs by not adhering to this practice. See Obataiye-Allah v. Va. Dep't of Corr., No. 7:15CV00230, 2016 WL 5415906, at *14 (W.D. Va. Sept. 28, 2016) (denying summary judgment on a RLUIPA claim when the plaintiff, an IM-0 status inmate, could not attend his mandatory Nation of Islam religious services due to his status). Accordingly, for purposes of summary judgment, Allah has shown that his rights have been substantially burdened.[6]

Next, the burden shifts to the government to show that the prison policy is the least restrictive means of furthering a compelling governmental interest. Defendant Robinson states in his affidavit that allowing level "S" offenders to congregate in person would create "too great a security threat to staff, and to each other[.]" Robinson Aff., ECF No. 26-4, ¶ 12. Notably, level "S" offenders must be held in a segregation setting because they pose a significant security risk, and many of the segregation qualifiers to classify level "S" offenders include violent behavior against both staff and other offenders. Defendant Robinson argues that the "risk of harm is not absent simply because the activity being conducted is a religious

---

[6] In Obataiye-Allah, the defendants did not provide evidence or argument on the second part of the RLUIPA standard, i.e., whether the policy of prohibiting IM-0 inmates from participation in group religious services, including closed circuit television services, furthered a compelling government interest by the least restrictive means, and the court did not address that issue. 2016 WL 5415906, at *14.

service" and that "in 2000, two inmates fatally stabbed to death another inmate during a religious gathering at Augusta Correctional Center." Id.

Additionally, Defendant Robinson states that allowing level "S" offenders to congregate in person "would be financially and logistically infeasible." Id. ¶ 10. This is because level S offenders would need to be monitored in accordance with VDOC policies to ensure continued safety and security of the unit. Id. ¶ 11. Although Defendant Robinson did not elaborate on the monitoring procedures, the court in Barnard v. Clarke, No. 7:15CV00160, 2016 WL 5373043, at *2 (W.D. Va. Sept. 26, 2016), described security measures for level S offenders as their being "restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells." Thus, two officers would be needed to transport each level "S" offender who wanted to attend a congregate service, creating a large demand for staff.

In Cutter, 544 U.S. at 723, the Supreme Court noted that Congress intended to give deference to prison administrators "in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Accordingly, the court finds that preventing level "S" offenders from congregating in person, but allowing them to have their religious materials in their cells and to request visits from spiritual leaders, is the least restrictive means available to further safety and financial concerns. See also Rodgers v. Shearidin, Nos. CCB-09-1962, CCB-10-3110, 2011 WL 4459092 (D. Md. Sept. 22, 2011) (finding that confinement of inmate in administrative segregation where he could not attend group worship services did not violate his rights under RLUIPA when inmates were permitted to practice religion in confines of cell and the chaplain provided evidence that communal religious services were not permitted because of security concerns).

Allah, therefore, does not state a claim under RLUIPA, based on his not being allowed to attend congregate services.

Allah also claims that his inability to watch NGE services over closed-circuit television violated his rights under RLUIPA. Because of his classification as IM-0, he was not allowed to have a personal television in his cell, which is considered a privilege earned by participating in prison programs. Robinson Aff., ECF No. 26-4, ¶ 14. The court recognizes that while being allowed to have a television is a privilege, access to religious programming is a right rather than a privilege. See Greenhill v. Clarke, 944 F.3d 243, 250 (4th Cir. 2019) ("Access to bona fide religious exercise is not a privilege to be dangled as an incentive to improve inmate conduct, and placing such religious exercise in the category of privilege to be earned is fundamentally inconsistent with the right to religious exercise that RLUIPA guarantees to prisoners.") (emphasis in original). Nevertheless, the institutional television system can only broadcast pre-recorded videos for religious groups, and ROSP does not have any pre-recorded NGE videos because none have been donated. Resp. to Interrogatories, ECF No. 26-2, ¶ 2. Therefore, Allah could not have watched NGE programming even if he were allowed a television in his cell or were housed in the general population. Accordingly, Allah cannot show that his rights under RLUIPA were violated because he was not allowed to have a television in his cell.

Relatedly, Allah claims that the failure to provide NGE religious programming via the closed-circuit television programming violates his rights under RLUIPA. However, while an inmate has a constitutional right to be free of certain state restrictions on his religious activities, the Constitution does not compel the state to affirmatively aid him in his spiritual journey. Lee v. Johnson, 793 F. Supp. 2d 798, 802 (W.D. Va. 2011). See also Fletcher v. Braxton, No. 7:04CV00374, 2005 WL 1654518, *2 (W.D. Va. July 12, 2005) (finding prison defendants not

liable for violation of religious liberty when they had sought religious materials from Jewish organizations for inmates' use but had not received any); Cruz v. Beto, 405 U.S. 319, 323 (1972) (Burger, C.J., concurring) ("There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, [religious] materials cannot be denied to prisoners if someone offers to supply them."); see also Coleman v. Governor of Mich., 413 F. App'x 866, 876 (6th Cir. 2011) (finding that policy limiting inmates in administrative segregation to basic television programming, as opposed to cable television programming, did not violate RLUIPA when they could receive religious literature via mail and could receive visitors to discuss their religious beliefs). Accordingly, Allah cannot show that his rights under RLUIPA have been violated because ROSP has not provided NGE religious programming to inmates.

Allah also claims that his lack of access to NGE religious programming violates his First Amendment right to practice his religion. Because Allah cannot show a violation under the more "plaintiff-friendly" RLUIPA standard, Burke v. Clarke, __ F. App'x __, 2021 WL 129937, at *6 (4th Cir. Jan. 14, 2021), he similarly has failed to show it under the First Amendment. Therefore, the court **GRANTS** summary judgment to Defendants on Allah's RLUIPA and First Amendment claims based on the failure to provide access to NGE religious programming.

### 2. Equal Protection Claim

Allah also claims that the failure to provide access to NGE religious programming violates his rights under the Equal Protection Clause. Allah does not provide any reasoning for why VDOC's congregate-religious policies violate the Equal Protection Clause. Allah has not alleged that only he or only those who identified as members of NGE were prohibited

from attending congregate religious services. Rather, the record indicates that all level "S" offenders were treated similarly, regardless of religious affiliation. See City of Cleburne, 473 U.S. at 439 (reasoning that the Equal Protection Clause requires that persons who are similarly situated be treated alike by the government); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (explaining that an equal protection plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated").

Allah also claims that the lack of NGE programming on the institutional television channel violates his rights under the Equal Protection Clause. Allah notes that ROSP played "Sunni Muslim[], Nation of Islam, Roman Catholic, and Jewish or Messianic Jewish" videos on the institutional television channel, but no NGE videos were broadcast. Compl., ECF No. 1 at 10–11. As previously noted, though, Defendant Cauthorne has not had received any donated videos of NGE services, and prisons do not violate the rights of prisoners when they try but fail to obtain religious programming for a particular religion. Cf. Fletcher, 2005 WL 1654518, at *4 (denying plaintiff's equal protection claim because Fletcher could not "show the current lack of [religious] materials is motivated by a discriminatory purpose" after prison officials attempted to obtain donated Jewish literature). Thus, even if NGE members did not have access to NGE-specific programming on the institutional religious channel, the unequal treatment was the byproduct of having no NGE videos to play and was not intentional or purposeful.

Allah has not shown that there is a material fact issue on his claim that the failure to provide access to religious services rises to the level of an equal protection violation. Accordingly, summary judgment is **GRANTED** for Defendants on this issue.

**B.  Denial of a Commissary Special Order Form**

Allah also claims that ROSP has a "repressive ban" on NGE-related religious materials, like medallions, Universal Flags, and crowns. The evidence in the case shows, though, that there is not a ban on these items, but that Allah was incorrectly informed by non-defendant R. Mullins that they were not approved and Mullins refused to give him the proper Commissary Form to order them.

Specifically, Defendants state that the NGE medallion and crown are approved by VDOC for offender possession, and that the Universal Flag is approved by VDOC, but for communal use only. ECF No. 26 at 5. Defendants note that a Universal Flag has not been donated to ROSP, so "the chaplain does not have a Universal Flag to make available during the NGE services at this time." Id.

Offenders at VDOC facilities can purchase religious faith items that are approved for offender possession under OP 841.3. OP 801.6 outlines the procedure for offenders to purchase pre-approved religious items. Offenders must complete the Commissary Form and submit it to the Facility Unit Head or designee for review and approval. OP 801.6, ECF No. 26-4 at 64. Next, the Facility Head or designee reviews the request to determine whether the item is eligible for offender purchase. Id. Once the contract vendor secures the property item, the commissary manager provides the offender "with a description of the item and notif[ies] them of the purchase price." Id. The offender must document their agreement on the Commissary Form, and the form is then forwarded to the Business Office for processing of payment. Id. The Personal Property Officer then receives a copy of the Commissary Form and distributes the special-order item(s). Id.

Allah has repeatedly sought a Commissary Form but received responses from Mullins telling him that the items were not approved. See Offender Request forms, ECF No. 35-2 at 51–54. Allah argues that the denial of a Commissary Form violated his rights under RLUIPA and the First Amendment and also his right to equal protection.

Defendants counter that because the NGE medallion and crown are approved for offender possession, Allah "should follow[] the ordering procedure specified in Operating Procedure 801.6 in order to obtain them." ECF No. 26-4 at 5. Presumably, Allah could also purchase a Universal Flag and donate it to the prison for communal use.

Allah has attempted to follow OP 801.6, but he cannot properly do so without having a Commissary Form. Allah alleges that he repeatedly asked officials at ROSP for a Commissary Form but has not been provided one. ECF No. 35 at 15. Additionally, even though Defendants note that the NGE medallion and crown that Allah requested to buy were approved for purchase, Allah was told that the items were not approved by VDOC. Compl., ECF No. 1 at 12–13; Offender Request forms, ECF No. 35-2 at 51–54.

Unfortunately for Allah, he did not name R. Mullins, the person who has refused to give him the Commissary Form, as a defendant in this lawsuit. The Defendants he named either told him to request the form from the commissary, which is the proper procedure outlined in OP 801.6, or they did not process his grievances. Because Mullins is not a defendant to this lawsuit, there is no issue of fact as to whether Allah's religious rights have been violated by any defendant under either RLUIPA or the First Amendment or whether his right to equal protection under the Fourteenth Amendment has been violated, because none

of the named defendants refused to allow him to purchase the items. Accordingly, summary judgment is **GRANTED** for Defendants on this issue.[7]

### C. Refusal to Remove STG Classification and Gang-Related Charges from Record

Allah claims that he is classified as part of an STG and that Defendants refused to remove the gang-affiliated charges for possessing NGE literature from Allah's record. Allah filed multiple informal complaints, grievances, and appeals regarding the STG issue that were either rejected at intake or never answered. Allah claims that his designation as a member of an STG and Defendants' failure to remove STG-related disciplinary convictions from his record violated his rights under RLUIPA and the First Amendment and also his right to Equal Protection under the Constitution.

#### 1. RLUIPA and First Amendment Claims

In 2017, VDOC was ordered to remove the STG designation from NGE and recognize NGE as a religion. Coward, 276 F. Supp. 3d at 576. Defendants assert that Allah is not currently designated as a member of an STG and that VDOC removed the STG designation from any offender who was designated an STG member solely based on NGE affiliation. Robinson Aff., ECF No. 26-4, ¶¶ 38, 39. Additionally, Defendants note that "VDOC did not retroactively eliminate any prior STG-related disciplinary convictions from the offender's disciplinary record" because "it was implausible to explore the individual circumstances underlying each conviction." Robinson Aff., ECF No. 26-4, ¶ 40. However, those STG-related disciplinary convictions "are not used to determine whether the offender is presently a

---

[7] The record does not disclose whether plaintiff has again sought (or obtained) the items since the filing of summary judgment. The court sees no reason, however, why these items cannot be ordered by plaintiff and provided to him, as permitted by policy. Even if non-defendant Mullins previously refused to provide the proper form to Allah, the court is certain that the appropriate officials at his facility can ensure no such refusal occurs again and that he is able to purchase the items he seeks.

member of an STG." Id. Accordingly, the presence of STG-related charges on Allah's record do not classify him as part of an STG and any request for injunctive relief to remove the designation is moot.

Allah claims that his prior classification as part of an STG and ROSP's failure to remove Allah's gang-related charges from his record violated his rights under RLUIPA and his First Amendment right to practice his religion.  This argument fails for several reasons. First of all, any § 1983 claim under the First Amendment is time-barred and is subject to dismissal on that ground. Thus, although defendants have not argued limitations in their motion, the court will dismiss the claim on this basis.  Cf. Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 956 (4th Cir. 1995) (en banc) (explaining that a court may summarily dismiss a complaint when it is clear from the face of a § 1983 complaint that a claim is barred by the applicable statute of limitations).

A § 1983 claim based on events that occurred in Virginia is subject to Virginia's two-year statute of limitations for personal injury actions. A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011); Lewis v. Richmond City Police Dep't, 947 F. 2d 733, 735 (4th Cir. 1991) (citing Va. Code Ann. § 8.01-243(A)). "The question of when a cause of action accrues under 42 U.S.C. § 1983 remains one of federal law." Nasim v. Warden, Md. House of Corr., 64 F. 3d 951, 955 (4th Cir. 1995) (emphasis in original). "Under federal law[,] a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Id. (citing United States v. Kubrick, 444 U.S. 111, 122-24 (1979)).

Here, Allah marks several offenses on his disciplinary record as "gang-affiliated institutional charges," Compl., ECF No. 1 at 10: two for possession of gang-related materials

or paraphernalia, one for attempting to commit aggravated assault on an offender, and one for attempting to commit aggravated assault on a non-offender.[8] See ECF No. 1-1 at 60-61. The only charges that mention anything gang-related are for possession of gang-related materials or paraphernalia. These charges occurred on November 15, 2012 and April 1, 2015. Id. At the time of these charges, Allah would have had the option, like the plaintiff in Coward, to challenge VDOC's classification of NGE as an STG. However, Allah did not file an informal complaint on these issues at ROSP until March 18, 2019, more than four years after the latest charge, and he did not file his complaint with this court until August 19, 2019. Compl., ECF No. 1 at 14, 21. Allah's filing with this court is well after the two-year statute of limitations.[9] Accordingly, Allah's First Amendment and Equal Protection claims based on his prior classification as part of an STG and ROSP's failure to remove gang-related charges from his record are time-barred.

Even if Allah's claims were not time-barred, Allah has not described how his prior classification as part of an STG or ROSP's failure to remove his gang-related charges from his record infringed on his ability to practice his religion. The Supreme Court has held that an offender has no constitutional right to be held at a specific security classification. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983). However, "[a]n inmate has a right to have erroneous information expunged from his files if: (1) the information is in his file; (2) it is false information that is not merely evaluations or opinions; and (3) the information is relied on to

---

[8] Allah denotes these gang-related charges on his disciplinary record using stars and boxes. See id.

[9] Although the Fourth Circuit has held that equitable tolling applies to the period during which a prisoner is exhausting his administrative remedies, Battle v. Ledford, 912 F.3d 708 (4th Cir. 2019), Allah's complaint makes plain that he did not begin pursuing administrative grievances on these issues until after the two-year limitation period had expired.

a constitutionally significant degree[.]" <u>Stanfield v. Graham</u>, No. GLR-16-4149, 2018 WL 1521871, at *3 (D. Md. Mar. 27, 2018) (citing <u>Paine v. Baker</u>, 595, F. 2d 197, 201 (4th Cir. 1979)).

Allah has not provided evidence that the failure to remove his gang-related charges has been relied on to a constitutionally significant degree or that the charges have affected his ability to exercise his religion. Allah's disciplinary record includes 26 offenses from 2004 to 2017.[10] <u>See</u> ECF No. 1-1 at 60–61. As discussed above, Allah marks several offenses on his disciplinary record as "gang-affiliated institutional charges." <u>See</u> Compl., ECF No. 1 at 10; ECF No. 1-1 at 60–61. Allah has not provided any evidence that his placement in IM-0 was a result of his religious beliefs, rather than a result of his lengthy, and sometimes violent, disciplinary record. <u>See</u> <u>Incumma v. Stirling</u>, 791 F. 3d 517, 535 (4th Cir. 2015) (requiring a RLUIPA plaintiff "to show that his religious beliefs, rather than his choice to [engage in other behavior warranting discipline], are the <u>proximate</u> cause of his continued solitary confinement" (emphasis added)).  He has failed to present evidence, therefore, that, absent his religious beliefs and exercise, he would not be in the same segregation level.  Furthermore, even if Allah's disciplinary charges affect his segregation level, he does not explain how that affects his current ability to practice his religion. Because disciplinary decisions and decisions about housing are uniquely tied to discipline, safety, and security, which must be given due deference, <u>Cutter</u>, 544 U.S. at 723, these decisions should not be disturbed lightly.

Accordingly, the court **DISMISSES** Allah's RLUIPA and First Amendment claims based on Allah's prior classification as part of an STG and ROSP's failure to remove Allah's

---

[10]  Some of Allah's charges include threatening bodily harm, fighting with another person, and possession of a weapon or contraband. <u>See</u> ECF No. 1-1 at 60–61.

gang-related charges from his record.  In the alternative, the court **GRANTS** summary judgment in Defendants' favor.

### 2.  Equal Protection Claim

Allah also claims that his alleged classification as part of an STG and ROSP's failure to remove the gang-related charges from his record violates his rights under the Equal Protection Clause but makes no argument that he is not being treated the same as similarly situated individuals. See City of Cleburne, 473 U.S. at 439–41. In addition to this claim being barred by limitations, summary judgment for defendants is appropriate because Allah has not provided evidence to show his classification as part of an STG and the ROSP's failure to remove Allah's gang-related charges from his record resulted in an equal protection violation. Accordingly, the court dismisses the claim as time-barred or, alternatively, summary judgment is **GRANTED** for Defendants on this issue.

### D. Disapproval of The Five Percenter

Allah claims that ROSP has a "repressive ban" on The Five Percenter, which resulted in ROSP disapproving Allah's copies of The Five Percenter on multiple occasions. Multiple times after Allah was notified that a particular Five Percenter issue was disapproved, he appealed the decision. After multiple levels of appeal, Allah was given The Five Percenter issue previously rejected. Although Allah received his newspapers eventually, they were several months old. Allah claims that the ban on The Five Percenter violated his rights under RLUIPA and the First Amendment and also his right to Equal Protection under the Constitution.

### 1.  RLUIPA and First Amendment Claims

Defendants argue that there is no "blanket ban" on The Five Percenter. ECF No. 26 at 6. Instead, all publications are reviewed at the facility prior to distribution pursuant to

VDOC Operating Procedure 803.2. Even if a publication is disapproved, offenders have the option to appeal the decision. Defendants note that each time Allah appealed the denial of his copy of The Five Percenter, "Defendant Robinson determined that the publication had been erroneously denied, and he approved possession of those items." Id.

It is well established that inmates may not be denied permission to purchase religious publications solely because of their religious beliefs. Cooper v. Pate, 378 U.S. 546, 546 (1964). Here, though, Allah was not denied permission to purchase his religious publications, but instead, some of his purchased religious publications were initially disapproved by ROSP. However, Allah always received his copies of The Five Percenter after utilizing the appeals system. Allah was never prohibited from participating in the appeals process and provides no evidence of a complete ban on The Five Percenter. Nor has Allah provided any evidence that this brief time without The Five Percenter issues was more than an "inconvenience" to his religious practice. See Smith, 502 F.3d at 1277 ("[I]n order to constitute a "substantial burden" on religious practice, the government's action must be "more than . . . incidental" and "must place more than an inconvenience on religious exercise." (internal quotations omitted)).

Allah has provided no evidence to overcome Defendants' assertions stating that no ban exists on The Five Percenter. Although it is unfortunate that Allah often had to wait to receive his copies of The Five Percenter, he ultimately received them after following the process outlined in OP 803.2. Accordingly, Allah's rights were not substantially burdened, and he does not state a claim under RLUIPA.

For the same reason, Allah has not shown that a fact issue exists on his First Amendment claim. Therefore, the court **GRANTS** summary judgment to defendants on

Allah's RLUIPA and First Amendment claims based on the disapproval of certain issues of The Five Percenter.

### 2. Equal Protection Claim

Allah also claims that the disapproval of certain issues of The Five Percenter violates his rights under the Equal Protection Clause. However, Allah gives no indication that The Five Percenter is disapproved at a higher rate than other publications or that other offenders have access to The Five Percenter while Allah does not. Because Allah has not provided enough evidence to show there is a material fact issue on his claim that disapproval of certain issues of The Five Percenter resulted in an equal protection violation, summary judgment is **GRANTED** for Defendants on this issue.

### E. Name Change

Allah also complains that after he began requesting NGE programming, Defendant Swiney retaliated against him by confiscating his identification card that reflected his "legally adopted cultural name," Asiatic Royalprince Allah, and replaced it with a card that reflected his original name, Vernon Brooks. Compl., ECF No. 1 at 8. Defendant Swiney responded that although Allah's name was changed from Vernon Brooks to Asiatic Royalprince Allah by court order in 2009, the order did not require VDOC to change his name for purposes of VDOC files and paperwork. Nonetheless, the name was erroneously changed for CORIS, the case offender management system, and on other VDOC correspondence. Affidavit of Walter Swiney, ECF No. 26-3, ¶ 4. After the error was discovered, the records were changed to reflect that Allah's name for VDOC's purposes is Vernon Brooks, although Asiatic Royalprince Allah is listed as an alternate name. Id. at 5. Swiney avers that he played no role in the name change

and said he has never threatened Brooks or retaliated against him on the basis of his religion. Id. at 6, 10.

Allah did not respond to Swiney's explanation of the name change. But in any event, Allah has not shown how the name change affected his religious freedom rights under either RLUIPA or the First Amendment and has not shown how the name change could be construed as a violation of his right to equal protection. Accordingly, summary judgment is **GRANTED** for Defendants on this issue.

### IV. Conclusion

As set forth above, the court **GRANTS** defendants' motion for summary judgment, ECF No. 25, and **DISMISSES** Allah's claims against all defendants.

An appropriate order will be entered.

It is so **ORDERED**.

Entered:      March 29, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.03.29 17:17:21
-04'00'

Michael F. Urbanski
Chief United States District Judge